Filed 9/16/15  P. v. Prestegui CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B252949 |
| Plaintiff and Respondent, | (Super. Ct. No. 1422669) |
| | (Santa Barbara County) |
| v. | |
| JOSE VASQUEZ PRESTEGUI, | |
| Defendant and Appellant. | |

Jose Vasquez Prestegui appeals from the judgment following his conviction by jury of lewd acts upon a child (Pen. Code,[1] § 288, subd. (a); counts 1, 8 & 9); aggravated sexual assault of a child by rape (§ 269, subd. (a)(1); counts 2 & 6); aggravated sexual assault of a child by sodomy (§ 269, subd. (a)(3); counts 3, 4 & 5); and continuous sexual abuse (§ 288.5; count 7).  The jury also found true a multiple victim allegation (§§ 667.61, subds. (b), (e)(4)).  The trial court sentenced appellant to 145 years to life in state prison.

Appellant contends that the trial court erred and violated his constitutional rights by (1) admitting statements which violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)); (2) admitting his involuntary confession;

---

[1] All statutory references are to the Penal Code unless otherwise stated.

(3) admitting concurrently charged offenses as propensity evidence; and (4) instructing jurors incorrectly on the use of charged offenses as proof of his propensity to commit other charged offenses. He further contends that his convictions of aggravated sexual assault and two counts of lewd acts upon a child cannot stand because, as charged, those crimes were all perpetrated against the same victim during the same time period as the continuous sexual abuse. Because section 288.5, subdivision (c) prohibits charging continuous sexual abuse as an additional rather than an alternative to contemporaneous assaults and lewd conduct, we vacate the continuous sexual abuse conviction and sentence and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

#### *Count 1: 2012 Lewd Conduct (J)*

In late August, when J was four years old, she and her family went to Santa Barbara to attend a family party at a home on East Gutierrez Street. Her aunt and uncle (M. and J.S.), their daughter (Y.), M.'s teenaged niece (I.V.), M.'s adult nephew (C.R.) and his family, along with appellant, resided there.

During the party, J was playing with other children. Appellant was throwing some of them in the air. The children also played hide and seek. J went into appellant's room to look for someone. Appellant was lying on the couch, watching a television show. She decided to watch it with him, and ended up lying on the couch. Appellant touched J's vaginal and anal areas, over her clothing.

J left the room to tell someone what happened. She saw I.V. and told her a man had just touched her in her "private" for about a second, when she went into his room to look for her cousin. Appellant was lying on the couch. As J bent to look under the couch, appellant touched her "private part." J described the incident again as M. and other adults approached. J.S confronted appellant and he denied everything. J said it was true. After denying that he touched her, he said he accidentally touched her when he caught her after tossing her in the air.

2

Someone called the police. Several officers arrived. Appellant immediately left, wearing a tank top and blue shorts.

J told Officer Aaron Denbrook that she went into a bedroom while playing hide and seek. Appellant was on the couch, and he touched her vagina for about a second.

Officers Nathan Beltran and Sergeant Lazarus pursued appellant. Although it was hot outside, he was wearing a sweater and a beanie when they found him on a nearby street. Appellant identified himself and displayed his California identification card. Beltran mentioned the incident with a young girl that occurred at appellant's home. Appellant said he knew what Beltran was talking about, and said he was only playing with the little girl. Appellant said he might have unintentionally touched her, by accidentally grabbing her breasts when he caught her, after throwing her in the air. After Beltran received additional information from Officer Denbrook, he arrested appellant.

Later that day, Brian Larson interviewed appellant at the police station. He said that while he was watching TV and petting his cat, the girl, J, wanted to jump on him. He just grabbed her and put her down. He had no idea where he touched her because it happened so fast. If he touched her in the crotch area, it was not intentional. Later, appellant said he was lying on the couch, and the girl lay down with him, like he was a dad or husband. She did not want to get up and he had to push her off. He thought he grabbed her under or between her legs to get her off the couch. He denied touching her intentionally.

*Counts 2-9: 2000-2005 Lewd Conduct and Sexual Assault Crimes (JM)*

Appellant was married to JM's mother (A.M) for several years when JM was from three to eight years old. JM, her brother (S.) and her sister (N.) lived in Ventura County with their mother and appellant. JM often stayed with A.M.'s grandmother (A.G.) and A.M.'s cousin (S.G.) for several days a week, but continued to live with her family at other times.

3

JM was 16 years old at the time of trial. She testified that when she was three years old, she lived with appellant, her mother and S. and N. Appellant kissed JM on her chest under her clothing, and put his fingers in her vagina. JM testified she believed that occurred in their apartment on North Ventura Road in Oxnard.[2] She could not recall how many times appellant had put his finger or fingers in her vagina, or touched her chest, but she estimated that it occurred more than 30 times. It started when they lived in the Ventura Road apartment. Appellant last penetrated JM's vagina with his finger when they lived in a condominium on Edelweiss, in March 2005.

One day, when JM was about four years old, she was home with appellant, N. and S., while A.M. was at work. JM was alone in her room, on the top of a bunk bed. Appellant entered and carried JM from her bed to the master bedroom. He put her on the bed, touched and kissed her chest, neck and stomach, and fondled her vagina. He put her under the bed covers, removed her pajama pants and underwear, and inserted his penis in her vagina. She cried from the pain. He repeatedly asked if she liked it. S. opened the bedroom door and asked where JM was. Appellant said she was just there hugging him.

After S. left, appellant pulled back the covers. JM got out of bed. She saw appellant's penis. He said, "Don't tell anyone, this is like our little secret." JM ran to the bathroom. While using the toilet, she saw a white substance and a couple of drops of blood coming from her vagina.

JM testified that appellant also raped her on another occasion when she was about three years old. Her mother was at work, and JM was sick at home. Appellant smelled like beer, and she vomited twice when he was raping her. She

---

[2] A.M. testified they lived in a several different locations in Ventura County from 2000 through 2005, including Santa Paula; at least three different locations in Oxnard, (an apartment on Vineyard; an apartment on Ventura Road; and a condominium on Edelweiss). A.M. had difficulty recalling and estimating dates and time frames.

left the room to call her mother. N. and S. called for her. Her mother told them to give JM medicine and leave her alone.

While the family lived in the Ventura Road apartment, appellant sodomized JM in his bedroom. He smelled like beer, and JM vomited on him and on the bed.

On another occasion, JM was in her room at the Edelweiss condominium, wrapped in a blanket, on the top of the bunk bed. She was not feeling well. Appellant entered her room. He was naked, and got in bed next to JM. He tried to insert his penis in her anus and repeatedly asked if she liked it. She repeatedly answered, "No." He got off the bed, threw the blanket at her, laughed and walked out. Appellant sodomized her on more than one other occasion in the Edelweiss condominium. One day, while her mother was at work, he called JM into his bedroom. After she entered, appellant closed the door, removed her pants and inserted his penis in her anus. He withdrew his penis, spit in his hand, rubbed his wet hand on his penis, and sodomized her again.

JM testified that she rode in the car with appellant to pick up her mother at work when they were living in the Edelweiss condominium. She was in the front seat, next to appellant. He moved JM's pants and underwear and put his fingers in her vagina. He also put one of her hands over his hand, to hold it in her vagina. JM believed this happened just days before she spoke with the police in 2005.

In March 2005, JM's mother (A.M.) was bathing her. JM said, "Daddy hurt me." Appellant had raped JM several days before. JM told A.M. he had used spit to wet his penis, and there was white stuff coming out of her "privates." JM had complained to A.M. before about appellant's hurting her but A.M. had not reported it to authorities. JM's latest complaint struck A.M. because when she had sex with appellant, he used spit as JM had described. A.M.

5

contacted Child Protective Services (CPS).[3]  CPS social worker Leticia Moreno and Oxnard Police Officer David Landsverk interviewed JM at home on March 15.  She described several incidents in which appellant had touched her in intimate places, most recently around March 12.  Landsverk testified that JM told him that when she was about three years old, appellant started touching her and continued doing so after they moved to the Edelweiss condominium.  She also described specific rape and sodomy incidents.

Sexual assault nurse examiner Sheri Dungan testified that she examined JM on March 16, 2005, in the presence of A.M. and a child advocate.  JM described how appellant would spit into his hand and showed her how he used his spit as a lubricant.  She said, "My daddy touches my privates [the one she pooped out of] with his privates."  She also said he kissed her on the lips with his tongue and kissed her on her chest, under her shirt, which scared and hurt her.  JM further reported that appellant put his penis in her vagina multiple times, which last happened "weeks ago."  A.M. told Dungan she learned about the sexual abuse when she was asking JM about her recent, frequent visits to the school nurse.

Appellant was arrested and charged with lewd acts on a child under the age of 14 and sodomy with a person under 18 years of age.

JM felt responsible for putting appellant in jail.  A.M. cried a lot and JM tried to console her.  A.M. was financially dependent on appellant and did not know how she would pay her bills without him.  She pressured JM to recant and say she had lied because she was mad at her dad.  At trial, A.M. testified that she had failed JM "as a parent."

In May 2005, after JM recanted her sexual abuse claims, Oxnard Police Sergeant Sharon Giles interviewed her at school.  JM seemed embarrassed and said that A.M. told her to say the sexual abuse had not occurred, and to say

---

[3] JM testified that prior to March 2005, when she told A.M. what appellant had done to her, A.M. always responded with a statement like, "Let's see what happens next time," and did nothing about the abuse.

6

she saw it on television.  JM said A.M. had been very sad, tearful, and lonely for appellant.  Giles reviewed a couple of the sexual abuse incidents JM had described to Landsverk.  JM confirmed that they did occur.  She said she loved appellant and "I think he has learned his lesson by being in jail and won't do that to me again."  Giles did not suspect JM was lying to her and she recommended the prosecution proceed with the case.  The prosecution dismissed the case and JM went to live with her maternal great-grandmother.

Santa Barbara District Attorney Investigator Norma Hansen located JM in 2012, in New Mexico, with her maternal great-grandmother.  Hansen conducted a taped interview of JM, who was then 15 years old.  JM described several sexual assaults appellant committed when she was younger.  They included a rape he committed after moving her from her bed into the master bedroom; a sodomy he committed when she was home sick; and his penetrating her vagina with his fingers while they were in the car picking her mother up from work.

Anthony Urquiza, a psychologist and the Director of the University of California Davis Medical Center's Pediatric child abuse treatment program, provided expert testimony concerning Child Sexual Assault Accommodation Syndrome (CSAAS).  Dr. Urquiza explained the five components of the syndrome: secrecy, a sense of helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction.  He testified that child sexual abuse victims often keep the abuse a secret; the child victim and the perpetrator usually know each other; it is not uncommon for the perpetrator to pressure the child to remain silent; and the victim often feels helpless.  He further testified that entrapment and accommodation refer to the victim's feelings of being stuck or trapped in the situation.  Delayed and unconvincing disclosure refers to the gradual and sometimes inconsistent revelations of the abuse, contrary to a common misperception that a child would immediately and fully recount the traumatic events.  Retraction refers to the recanting of a truthful disclosure about

the molestation. Of the child sexual abuse victims who report the abuse, approximately 25 percent recant their complaints.

### Defense Evidence

Ventura County Public Defender's Office Senior Investigator Wendy Carlton interviewed JM in April 2005. JM said she had seen appellant's penis, and he put his fingers and penis in her private parts. Later that month, Carlton went to A.M.'s home. While she was there, JM told Carlton that her complaints against appellant were untrue, and she made them up because she was mad at him. Appellant returned to A.M.'s home after his release from jail. He lived with her for less than a year, and they divorced later.

JM's brother S. testified that he lived with the family on Ventura Road. He had no knowledge that appellant had ever touched JM improperly. He could not recall her screaming that appellant would not let her leave the room. He vaguely recalled she might have asked him to call A.M. at work.

### DISCUSSION

### Miranda Claims

Appellant contends that the trial court violated his *Miranda* rights by admitting statements he made to Officers Beltran and Lazarus, and to Detective Larson. We disagree.

### Background

Citing *Miranda*, counsel for appellant moved to exclude a statement he made to Beltran immediately after officers responded to J's complaint, and his subsequent statements to Larson at the police station. Beltran testified that he and Lazarus were in M.'s and J.S.'s neighborhood on August 26, in the afternoon, walking southbound on North Voluntario Street. He saw appellant walking in their direction on the same side of the street. Upon seeing the officers, appellant slowed down, crossed the street, and changed direction. The officers met him across the street and spoke with him on the sidewalk. Appellant identified himself, showed them his California identification card and said he lived on East

8

Gutierrez Street in Santa Barbara. The officers said they wanted to speak with him about an incident at his home involving a young girl. Appellant appeared to know exactly what they were talking about. He first explained that he was playing with the little girl and other children and throwing them in the air. He said he might have accidentally touched the girl's breasts while catching her on the way down. Appellant was not under arrest. Beltran was just detaining him and giving him a chance to tell his side of the story. Because he did not believe he had probable cause to arrest appellant at that point, Beltran did not advise him of his *Miranda* rights. Beltran did not conduct a patdown search, draw his gun, or take any safety measures while speaking with appellant. Their encounter was casual. Appellant did not refuse to answer any questions.

The trial court concluded that appellant was not in custody when Beltran spoke with him in a "public place on a public street" during daylight hours. He noted further that the encounter was consensual, Beltran and Lazarus did not draw their guns, and appellant's "response didn't suggest that he understood that he was in some way constrained of his liberty."

Later, appellant's counsel advised the court that appellant stated he had asked for a lawyer before Larson conducted the first of two videotaped interviews on August 26, 2012. Larson testified that appellant did not request a lawyer before the interview. The court then reviewed Larson's taped *Miranda* advisement. Appellant indicated he understood his rights. Instead of asking whether appellant waived his rights, Larson asked, "Can you tell me your side of the story?" Appellant responded, "Yeah," explained what happened and responded to Larson's questions. The court ruled that appellant had impliedly waived his *Miranda* rights.

Statements made during a police interrogation of a person in custody are inadmissible unless the police have advised the person of his or her rights to remain silent and to an attorney, and that statements made by the person may be used as evidence. (*Miranda*, *supra*, 384 U.S. at p. 444; see *People v. Leonard*

9

(2007) 40 Cal.4th 1370, 1399-1400.)  These rights attach when the person is in custody, in the sense that "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  (*California v. Beheler* (1983) 463 U.S. 1121.)  The question of whether a person is in custody is determined by "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  (*Stansbury v. California* (1994) 511 U.S. 318, 323.)  We "defer to the trial court's resolution of disputed facts, including the credibility of witnesses, if that resolution is supported by substantial evidence," and independently determine whether the challenged statement was obtained in violation of *Miranda*.  (*People v. Davis* (2009) 46 Cal.4th 539, 586.)

Appellant first claims that the trial court violated his *Miranda* rights by admitting his statement to Beltran and Lazarus because he was not given his *Miranda* warnings before they questioned him.  We disagree.  The officers questioned appellant on a public street, during the daytime, without using handcuffs or any physical restraint upon him.  His responses "didn't suggest that he understood that he was in some way constrained of his liberty."  Such evidence supports the court's finding that appellant was not "in custody" when Beltran and Lazarus questioned him.  Consequently, they were not required to advise appellant of his right to remain silent.  (*People v. Stansbury* (1994) 9 Cal.4th 824, 832-833.)

Appellant next claims that the trial court erred in finding that he impliedly waived his *Miranda* rights at the police station because "the court did not take into account the effect of having been previously questioned by Beltran and Lazarus without being advised of his *Miranda* rights."  We disagree.  The court necessarily considered the fact that Beltran and Lazarus questioned appellant on the sidewalk without advising of him of his *Miranda* rights.  It had to do so before it ruled Beltran and Lazarus were not required to so advise him because he was not in custody.

10

A waiver of the right to remain silent may be express or implied from the totality of the circumstances, including the suspect's actions and words. (*Berghuis v. Thompkins* (2010) 560 U.S. 370.)  A suspect who has knowledge of his rights may impliedly waive his right to remain silent by failing to unambiguously invoke his right and answering questions posed by police.  (*Id*. at pp. 379-386.)  In this case, Larson admonished appellant of his rights.  Appellant indicated he understood them.  When Larson asked if he could tell him his "side of the story," appellant said, Yeah," explained what happened and answered Larson's questions.  Exercising our independent review and considering the totality of the circumstances surrounding appellant's interrogation, we conclude that appellant made a valid, implied waiver of his *Miranda* rights.

Appellant argues that the trial court erred by admitting statements he made after he exercised his right to stop the second interview, which Larson continued, without regard to appellant's *Miranda* rights.  We disagree.  The relevant portion of the interview follows:

"[Appellant]:  I can't say nothing else.

"Larson:  Listen, listen, listen.

"[Appellant]:  No more.

"Larson:  Listen.  Stop. No – you're telling – you're telling things that are unbelievable."

The trial court ruled that appellant did not make an "unequivocal, clear invocation of rights," to convey he wanted the interview to stop.  It denied the motion to exclude the "remainder of the interview."

After a suspect waives his rights, officers are not required to cease questioning unless the suspect makes an unambiguous and unequivocal invocation of the right to silence or counsel.  Nor are they required to clarify whether the suspect is invoking the right to silence if he makes an ambiguous or equivocal statement.  (*People v. Martinez* (2010) 47 Cal.4th 911, 947-949.)  The trial court correctly concluded that appellant failed to make an unambiguous and unequivocal

11

invocation of the right to silence.

<em>Involuntary Confession Claim</em>

Appellant contends that the trial court erred by admitting his confession to Larson because it was involuntary. More specifically, he claims that Larsen encouraged him to discuss the crime by implying that he would not be charged with a crime. The record belies his claim.[4]

"A criminal conviction may not be founded upon an involuntary confession. [Citation.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] . . . Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] "'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.'" [Citation.]' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

Respondent argues that that appellant waived this claim by failing to raise it below, and that any error associated with the admission of appellant's confession was harmless. Waiver aside, the claim lacks merit. Larsen urged appellant as follows: "I understand that you've been a victim before and that you have wounds, you know, injuries inside th[at] need to get healed. But I – and these things are hard to talk about. I really respect you for telling me the truth and being very open here when we just met today. Uh, so what I want to do is give you the chance to kind of wipe it out and start fresh. Because I think there's some things that maybe you've been nervous about telling me, and I understand why. These things are difficult to say. [¶] The things that you were telling the truth about are difficult – they're hard – maybe they make you feel embarrassed or shameful and I understand that. So I'm not gonna say your lying change[d] it, but

---

[4] This court has reviewed the exhibits of the entire interrogation (exhibits 36, 37, 38, 39), including the taped exhibits.

12

what I want to do forget everything we said – no shame, no embarrassment I will not accuse you, but tell me what actually happened in the room."  Appellant claims that Detective Larsen's comment, "I will not accuse you, but tell me what actually happened," amounted to an express promise of leniency.  We disagree.

Larsen's comments must be construed under the "'totality of the circumstances.'"  (*People v. Dykes* (2009) 46 Cal.4th 731,752.)  Viewed in that context, the interrogation did not transgress the guidelines that govern police interrogations.  There was no evidence that Larsen threatened or injured appellant, or that the interrogation took place under less than ordinary circumstances.  "The Fifth Amendment privilege is not concerned with moral and psychological pressures to confess emanating from sources other than official coercion." (*Berghuis v. Thompkins*, *supra*, 569 U.S. at p. 387.)  Appellant was not "promised" leniency for providing a statement or "threatened" with punishment for refusing to do so, and nothing Larsen said or did during the interrogation suggests that appellant's statements were coerced.  Further, any error in admitting his statements was harmless beyond a reasonable doubt.  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310-311; *People v. Cahill* (1993) 5 Cal.4th 478, 507, 509-510.)  Appellant not only admitted to Larsen that he touched J, briefly "on purpose" and possibly as "payback" for sexual abuse he suffered as a child, he also repeatedly told Larsen that the touching was accidental.  Moreover, independent of his statements to Larsen, other evidence undermined any claim that the touching was accidental. Appellant made inconsistent statements to other adults about his conduct with J.; he fled his residence when the police arrived; and he tried to change his appearance before the police found him.  His statements to Larsen were "unimportant in relation to everything else the jury considered on the issue in question."  (*Yates v. Evatt* (1991) 500 U.S. 391, 403, disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

13

*Propensity Evidence*

Appellant claims that the trial court erred by admitting concurrently charged offenses for the purpose of determining whether he had the propensity to commit the charged offenses. We disagree. A charged sex crime may be used to prove a defendant's propensity to commit another sex crime charged in the same case. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1156 (*Villatoro*).)[5]

*Modified CALCRIM NO. 1191*

Appellant contends the court erred by instructing jurors with a modified version of CALCRIM No. 1191 which allowed them to consider concurrently charged offenses in deciding if he was guilty of other concurrently charged offenses. More specifically, he argues that the modified instruction undermined the presumption of innocence and the beyond a reasonable doubt standard of guilt. We disagree.

In reviewing a claim of instructional error, we determine whether there is a reasonable likelihood the jury understood the instruction in a way that violates the Constitution. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We determine the correctness of jury instructions from the entire charge of the court, not by judging an instruction or portion of an instruction in artificial isolation. (*Ibid.*) We assume that jurors are intelligent persons and capable of understanding and correlating all instructions given to them. (*Ibid.*) The absence of an essential element from one instruction may be cured by another instruction, or by the instructions viewed as a whole. (*People v. Smith* (2008) 168 Cal.App.4th 7, 13.)

The modified CALCRIM No. 1191 given below provides in relevant part: "The People have presented evidence that the defendant committed the

---

[5] We reject the related claim that the court erred by admitting the concurrently charged offenses as propensity evidence without making an express finding pursuant to Evidence Code section 352 that its probative value outweighed its prejudicial impact. (*Id.* at p. 1168.)

14

charged crimes of lewd acts upon a child . . . Aggravated Sexual Assault of a Child . . . and Continuous Sexual Abuse of a Minor . . . that were charged in this case. [¶ . . . ¶] You may consider this evidence if the People have proved by a preponderance of the evidence that the defendant committed the charged or uncharged crimes. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely. [¶] If you decide, by a preponderance of the evidence, that the defendant committed the charged or uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit Lewd Acts Upon a Child . . . Aggravated Sexual Assault of a Minor . . . or Continuous Sexual Abuse of a Minor . . . as charged here. [¶] If you conclude that the defendant committed any or all of the charged or uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Lewd Acts Upon a Child . . . or Continuous Sexual Abuse of a Minor . . . . The People must still prove each charge and allegation beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's proclivity to commit sex offenses. [¶] If the People have not met this burden of proof, you must disregard this evidence entirely."

Respondent argues that the modified CALCRIM No. 1191 given below is proper because its language is "substantially similar" to the instruction approved by our Supreme Court in *Villatoro*, *supra*, 54 Cal.4th at p. 1165. The instructions are not "substantially similar." The *Villatoro* instruction did not mention the preponderance of the evidence standard of proof. Moreover, it expressly required the prosecution to "'*prove each element of every charge beyond*

15

*a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge*'" (*Id.* at p. 1167, italics added.) The Supreme Court reasoned that because the instruction "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity[,] there was no risk the jury would apply an impermissibly low standard of proof." (*Id.* at p. 1168.) "Requiring the jury to apply two standards of proof to evidence of the same crime would inevitably lead to confusion and could potentially erode the presumption of innocence." (*Id.* at p. 1181 (conc. & dis. opn. of Corrigan, J.).) The modified CALCRIM No. 1191 given at trial lacked clarifying language comparable to that in the *Villatoro* instruction. Nonetheless, the instructions as a whole cured the flaw in the modified CALCRIM No. 1191. The court properly instructed jurors with CALCRIM No. 220, the standard reasonable doubt instruction The modified CALCRIM No. 1191 instruction stated the prosecution was still required to "prove each charge and allegation beyond a reasonable doubt." During argument, the prosecutor reminded jurors that "ultimately, in order to convict you still must find him beyond a reasonable doubt guilty to the legal standard." There is no reasonable likelihood the jury understood the modified CALCRIM No. 1191 instruction in a way that undermined the beyond a reasonable doubt standard of proof or otherwise violated the Constitution. (*People v. Richardson*, *supra*, 43 Cal.4th at p. 1028.)

*Continuing Conduct*

Appellant contends that his convictions cannot stand both on the count 7 section 288.5 continuous sexual abuse offense and on the count 2-6 and 8-9 sex offenses because, as charged, the crimes were all perpetrated against the same victim during the same time period. He urges us to reverse counts 2-6 and 8-9, or at a minimum, to reverse count 7. We conclude that the time periods alleged for specific acts charged in counts 4, 5, 6, 8 and 9 of the information impermissibly overlap with the time period alleged for the continuous sexual

16

abuse charged in count 7.  Thus, we will vacate the count 7 conviction and sentence.

Section 288.5, subdivision (c), which defines continuous sexual abuse, provides that "[n]o other act of [lewd act upon a child or aggravated sexual assault of a child] involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative."

The amended information contained allegations that appellant raped JM (count 6) and sodomized her (counts 4, 5), on two unspecified dates from January 1, 2003 through March 15, 2005.  It also alleged that he raped her (count 2) and sodomized her (count 3) on two unspecified dates from March 5, 2000 through March 15, 2005.  It further alleged that he continuously sexually abused her (count 7) and committed two lewd acts upon her (counts 8 and 9) from January 1, 2001 through March 15, 2005.  The continuous sexual abuse was not alleged in the alternative.

The time periods alleged for the acts charged in counts 4, 5, 6, 8 and 9 impermissibly overlap with the time period alleged for the count 7 continuous sexual abuse.  Because the continuous sexual abuse was not charged in the alternative, his conviction for that offense violates section 288.5, subdivision (c).  Accordingly, we will vacate appellant's conviction and sentence for the count 7 continuous sexual abuse.  (See *People v. Torres* (2002) 102 Cal.App.4th 1053, 1060-1061.)

DISPOSITION

Appellant's count 7 continuous sexual abuse conviction and the 15-year-to-life sentence for that count are vacated.  The modified sentence is 130 years to life.  Upon remand, the superior court shall prepare an abstract of

17

judgment to reflect the judgment, as modified, and provide a copy to the Department of Corrections.  The judgment is otherwise affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Brian E. Hill, Judge

Superior Court County of Santa Barbara

_____

Jean F. Matulis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Tita Nguyen, Deputy Attorney General, for Plaintiff and Respondent.